902 P.2d 1299 (1995)
In the Matter of the ESTATE OF Stewart Eric BRANDON, Jr.
Catrina Crume BRANDON, Through her Guardian Ad Litem, Donna C. WILLARD, Appellant and Cross-Appellee,
v.
HEDLAND, FLEISCHER, FRIEDMAN & COOKE, Appellee and Cross-Appellant, and
Estate of Stewart Eric Brandon, Jr., Joseph L. Kashi, Helen Carter and Eric Stewart Brandon, Sr., Appellees,
HELLÉN & ACCINELLI, a professional corporation, Appellant and Cross-Appellee,
v.
HEDLAND, FLEISCHER, FRIEDMAN & COOKE, Appellee and Cross-Appellant, and
Joseph L. Kashi and Robert M. Cowan, Appellees,
HEDLAND, FLEISCHER, FRIEDMAN & COOKE, Cross-Appellant and Appellee,
v.
HELLÉN & ACCINELLI, a professional corporation, and Catrina Crume Brandon, through her Guardian Ad Litem, Donna C. Willard, Cross-Appellees and Appellants.
Nos. S-5366, S-5382, and S-5383.
Supreme Court of Alaska.
August 18, 1995.
*1301 Before MOORE, C.J. and RABINOWITZ, COMPTON and EASTAUGH, JJ.
Donna C. Willard, Law Offices of Donna C. Willard, Anchorage, Guardian Ad Litem for Catrina Crume Brandon.
Roger F. Holmes, Biss & Holmes, Anchorage, for Hellén & Accinelli, P.C.
James R. Blair, Bliss Riordan, Fairbanks, for Hedland, Fleischer, Friedman, Brennan & Cooke.
Kenneth P. Jacobus, Kenneth P. Jacobus, P.C., Anchorage, for Joseph L. Kashi.
Michael W. Flanigan, Walther & Flanigan, Anchorage, for Robert M. Cowan.
Paul L. Davis, Law Offices of Paul L. Davis and Associates, Anchorage, for Stewart Eric Brandon, Sr.
Hugh G. Wade, Wade & De Young, Anchorage, for Helen Carter.
Before MOORE, C.J., and RABINOWITZ, COMPTON and EASTAUGH, JJ.

ORDER
IT IS ORDERED:
1. Hedland, Fleischer, Friedman, Brennan & Cooke's petition for rehearing, filed on June 12, 1995, is DENIED.
2. Joseph L. Kashi's petition for rehearing, filed on June 12, 1995, is GRANTED in part, DENIED in part. The opinion will be reissued with the amendments to page 29 of the opinion (additions underlined, deletions bracketed):
[The only] No facts bearing on paternity were offered to the trial court at the September 4, 1990 [evidentiary] hearing until [,] after the court had already approved the proposed settlement agreement. [All t] The only [known] facts produced at the September 4, 1990 evidentiary hearing supported Catrina's paternity claim, and consequently were inconsistent with paying anything to Carter or Brandon.
3. Opinion No. 4216 published on June 2, 1995, is WITHDRAWN.
4. Opinion No. 4240 is issued on this date in its place.
Entered by direction of the Court at Anchorage, Alaska, on August 18, 1995.

OPINION
EASTAUGH, Justice.

I. INTRODUCTION

These consolidated appeals raise issues regarding the allocation of proceeds of a wrongful death lawsuit brought after Stewart Eric Brandon, Jr., (Eric) died in an air crash. The disputants are Eric's minor daughter, Eric's non-dependent parents, and various attorneys claiming attorney's fees.
We reverse the superior court's allocation because it failed to satisfy the requirements of Alaska Rule of Civil Procedure 90.2.

II. FACTS AND PROCEEDINGS

A. Eric's Survivors

Eric Brandon was killed in November 1987 when the Ryan Air Service commuter aircraft in which he was a passenger crashed on approach to landing at Homer. He was twenty-three years old and died intestate.
Catrina Crume was born about two years before Eric's death. Christy Crume is Catrina's mother. Catrina's paternity was never formally established during Eric's lifetime, but he admitted to Christy and others he was Catrina's father. Eric's divorced parents, Stewart Eric Brandon, Sr., (Brandon), and Helen Carter (Carter), were both aware of Catrina's existence after her birth. Christy and Eric never married.

*1302 B. The Lawsuits

Carter lived in Pennsylvania. Soon after the crash, she contacted Philadelphia attorney Jeffrey Voluck who asked Anchorage attorney John Hedland, of the firm of Hedland, Fleischer, Friedman, Brennan & Cooke (collectively "Hedland"), to bring a wrongful death action in Carter's behalf. Hedland agreed to represent Carter on a contingent fee basis.
Brandon, who lived in the Kenai/Soldotna area, retained Soldotna attorney Joseph Kashi to represent him. In February 1988 Brandon, through Kashi, filed Case No. 3KN-88-22PR in Kenai and asked the superior court to appoint him personal representative of his son's estate; apparently simultaneously, Brandon began Case No. 3HO-88-53 Civil in Homer by filing a wrongful death complaint that alleged he was the "custodian and personal representative of the estate of the decedent." In neither case did Brandon mention the possibility Eric had left a minor child, although Brandon was allegedly "well aware" of a possible child.
In early 1988 Carter, through Hedland, filed Case No. 3AN-88-1988 PR in Anchorage and asked the superior court to appoint her personal representative of her son's estate. In April 1988 Carter opposed Brandon's application to be appointed personal representative and asserted that there was a possibility Eric had left a child.
In late 1987 Christy Crume, Catrina's mother, approached attorney Robert Cowan about asserting a claim on behalf of Catrina as a result of Eric's death. Learning later of the lawsuits filed by Brandon and Carter, and having contacted their attorneys, Cowan asked attorney Olof Hellén, then at Hellén, Partnow & Condon, to help represent Catrina's interests.
In December 1988 Superior Court Judge Charles K. Cranston appointed Carter and Brandon co-personal representatives of the estate in Case No. 3KN-88-22PR; Judge Cranston noted Catrina was Eric's purported minor child and charged Carter and Brandon with the duty of ascertaining Eric's heirs.
In January 1989 Christy Crume retained Hellén and Cowan to represent Catrina's interests on a contingent fee basis. Hellén and Cowan agreed to share responsibility and split the fee equally.
In February 1989 Catrina, through Hellén, filed Case No. 3KN-89-149 Civil, a suit against the co-personal representatives, seeking a declaration that Eric was Catrina's father.
It was later alleged that Carter and Brandon "vigorously contested" Catrina's efforts to resolve the paternity question and "every aspect" of her paternity case, moved to dismiss the claim, and resisted her application to test their blood, claimed someone else was actually Catrina's father, and failed to seek out Eric's heirs.[1] It was also alleged that Hedland and Kashi assisted Carter and Brandon, respectively, in their efforts to contest Catrina's paternity claim. Blood testing of Brandon and Carter was not completed until February 1990.
In August 1989 Hedland and Kashi agreed to represent the estate on a contingent fee basis. Carter and Brandon signed the contingent fee agreement for the estate. Carter and Brandon then filed Case No. 3HO-89-204 Civil, a wrongful death action against Ryan Air; it was consolidated with Case No. 3HO-88-53 Civil, the wrongful death suit previously brought by Brandon.
In June 1990 results of the genetic blood testing were provided to Hedland; they established to a very high probability that Catrina was Eric's daughter.[2]
*1303 The paternity trial was to begin September 4, 1990. The wrongful death trial was to begin October 29, 1990.

C. The 1990 Paternity Settlement

On September 4, 1990, the parties in the paternity suit presented Judge Cranston with a "Stipulation for Settlement." The stipulation had been executed by the parties' attorneys, Hellén, Hedland and Kashi. No motion or explanatory memorandum accompanied the proposed agreement. Per the agreement, (1) Carter and Brandon would withdraw their opposition to Catrina's paternity claim; (2) Christy, Brandon, and Carter would become co-personal representatives of Eric's estate in the wrongful death action, and would participate and cooperate fully in prosecuting that claim against Ryan Air; (3) Christy would "endeavor to facilitate a reasonable and enduring relationship" between Catrina and her grandparents, Carter and Brandon; (4) the parties would bear their own costs and attorney's fees incurred in the probate and paternity actions; and (5) any wrongful death proceeds (net of expenses) would be divided as follows: (a) Catrina would receive 66-2/3% subject to the rights of attorneys Hellén and Cowan; (b) Carter and Brandon would jointly receive 33 1/3% subject to the rights of their attorneys; (c) Hedland would remain as active co-counsel, subject, however, to being discharged by Catrina, and would receive "additional compensation" of 5% of net proceeds exceeding $612,000 (the amount of Ryan Air's last offer).
Before approving the settlement, Judge Cranston briefly discussed Alaska Civil Rule 90.2 with Hellén, Kashi and Hedland; Hedland told the court that Rule 90.2's minor settlement procedure did not apply to the September 4 agreement, but that court approval would be required for any future settlement with Ryan Air and for disbursement of any proceeds of the wrongful death suit. Kashi and Hellén did not dispute Hedland's advice. They acknowledged the court would have to approve any future settlement. The court stated that the agreement did not excuse the parties' duty to obtain approval of a future minor settlement or the court's duty to approve a subsequent minor settlement and any award of attorney's fees. Hedland asserted that the substance of the September 4 agreement would not be open for reconsideration during any future minor settlement hearing, and the court responded, "No, I don't think it is.... [I]f there is a settlement in the [wrongful death] case, then that phase of the case has to be subject to a minor settlement."
The proposed order approving the stipulation stated it was "entered as a final order and judgment." Judge Cranston signed the order on September 4, 1990.
After signing the order, the court heard evidence supporting Catrina's claim that Eric was her father.[3] No opposing evidence was *1304 offered. The appellate record contains no facts that might have overcome the great weight of evidence supporting Catrina's paternity claim.[4] At the conclusion of the paternity hearing, Judge Cranston found the evidence sufficient to declare paternity.

D. The Ryan Air Wrongful Death Settlement

Following the paternity hearing, attorneys Hellén and Hedland prepared for the wrongful death trial against Ryan Air. Ryan Air's liability had been established as a matter of law before trial; the National Transportation Safety Board had determined that the cause of the crash was overloading and improper loading. The trial began in November 1990. The jury awarded the estate damages of $2,800,000 against Ryan Air. With costs, attorney's fees and prejudgment interest, the total judgment was $4,627,885.
Ryan Air appealed the judgment to this court.
In late November 1991, while Ryan Air's appeal was pending, Ryan Air and the estate negotiated a proposed settlement of $4.25 million; with post-judgment interest, the judgment then totalled approximately $5.1 million.
In December 1991 the estate's personal representatives (Carter, Brandon, and Christy) petitioned the superior court under Civil Rule 90.2 for approval of the proposed settlement with Ryan Air. They filed the petition in a new action brought for that purpose, Case No. 3KN-91-83 PR-MS (minor settlement action). The memorandum supporting the petition stated that the proposed Ryan Air settlement was in accordance with Alaska law "since the minor child, Catrina Crume is the only statutory beneficiary" of the decedent. Petitioners noted that in 1990 the court had approved an agreement allocating one-third of the net recovery to Carter and Brandon. On December 5, 1991, after conducting a hearing, Judge Cranston approved the estate's proposed settlement with Ryan Air but stated that there would be no disbursements until further order.

E. Allocation of the Settlement Proceeds

Soon after, Hellén asked the court in the minor settlement action to allocate from the Ryan Air settlement proceeds $1,252,655 for Catrina, $1,259,762 for attorney's fees for Hellén and Cowan, and $114,466 for litigation costs. Hellén in part justified the proposed fee by the substantial time spent litigating paternity. Hedland, Kashi, and Paul Davis ("independent counsel" brought in by Brandon and Christy) opposed Hellén's request, arguing in part that Hellén's proposed fees would be excessive and that Hedland's 5% "additional compensation" should be deducted from Hellén's fee, not from Catrina's portion. Hedland noted that under Hellén's proposal, the child would receive approximately 30% of the net Ryan Air settlement proceeds, about $7,100 less than the amount Hellén and Cowan, the child's attorneys, would receive. Hedland instead proposed that Catrina receive approximately $2,709,163, between $498,486 and $548,334 of which would be paid to Hellén and Cowan.
Hedland then asked the court to make the following additional disbursements from the Ryan Air settlement proceeds, in accordance with the September 4, 1990 order: (1) payment to Hedland of "additional compensation" *1305 of $181,900[5]; (2) payment of $81,355 to Hedland and $14,944 to Kashi to reimburse costs; (3) payment of 21 1/6% of the net proceeds jointly to Carter and her attorneys, and 12 1/2% of the net proceeds jointly to Brandon and his attorney. Hedland did not specify the fees Hedland, Voluck and Kashi would receive from their contingent fee agreements with Carter and Brandon, but Hellén calculated those fees to total $674,700, not including Hedland's 5% "additional compensation" fee. As calculated by Hellén, Hedland's fee per his agreement with Carter should have been $398,400. The total sought for Brandon, Carter, Hedland and Kashi was approximately $1,600,000.
As of February 1992 no party contended that Carter and Brandon should take anything less than the amounts calculated per the September 1990 order.
Soon after, Superior Court Judge Jonathan H. Link appointed Donna C. Willard guardian ad litem (GAL) to represent Catrina's interests in No. 3KN-91-83 PR-MS and commented that, "[T]hroughout all these proceedings the infant ... has been represented by attorneys employed by her mother.... At no time has Catrina ... been represented by anyone solely responsive to her interests."
The GAL filed a report that proposed attorney's fees allocations that would have left Catrina a net recovery of $2,160,153. Among other things, the GAL noted that (1) Ryan Air's liability had been established as a matter of law prior to the wrongful death trial; (2) the fees requested by the attorneys totaled $2,129,660.43, approximately 50% of the gross recovery; (3) Carter and Brandon, although no longer beneficiaries of Eric's estate given Catrina's paternity, claimed an additional $679,402.56; (4) Catrina's ultimate recovery would be $1,367,515, only 32% of the gross recovery, if all the fees and costs requested by the attorneys were paid; (5) Hedland benefitted not only from the "additional compensation" term of the 1990 settlement agreement, but also from Brandon's agreement to cede part of his share to Carter; (6) there was a dispute about whether Hedland's "5% bonus" should come from Catrina's net recovery or from Hellén's share and whether it should be based on the gross recovery of $4,250,000 or the net recovery of $4,076,578; and (7) Brandon and Christy Crume objected to paying any "bonus" to Hedland because they had not known of or agreed to any "additional compensation."
The GAL also criticized the manner in which Carter and Brandon carried out their responsibilities as co-personal representatives of the estate. Specifically, she alleged in her report that conflicts of interest potentially existed between the estate's original personal representatives (Carter and Brandon) and Catrina, who was identified early as potentially the only statutory beneficiary; that Carter and Brandon apparently had attempted to defeat Catrina's paternity claim and resisted Christy Crume's attempts to be appointed personal representative; and that as of September 4, 1990, Carter and Brandon had demanded a share of the recovery, and their demands were supported by Brandon's threat not to produce witnesses or evidence needed for a substantial award at the wrongful death trial unless he received a share of the proceeds.
Claiming that various attorneys had violated their ethical responsibilities, the GAL also alleged that Hedland, the estate's lead attorney in the claim against Ryan Air, had threatened to withdraw from the Ryan Air suit and be uncooperative if he were not given a "bonus"; that Hedland and Kashi had substantial conflicts of interest because they represented both Eric's estate (of which Catrina was a potential beneficiary) and Carter and Brandon (who had opposed Catrina's paternity claim); and that there were at least three instances of fee splitting between attorneys, in potential violation of Alaska Disciplinary Rule (DR) 2-107.
The GAL noted that Civil Rule 90.2 applied to disbursement of the settlement proceeds and argued that the court was entitled to review the "efficacy of the original September 4, 1990 settlement." The GAL recommended that (1) Catrina receive $2,160,153; *1306 (2) the total attorney's fees be $1,416,525, one-third of the gross settlement proceeds;[6] and (3) Brandon and Carter equally share $500,000, on the theory that but for Catrina's presence in the lawsuit, the approximate gross value of the claim would have been $800,000, of which the parents would have equally shared about $533,360 after costs and fees.
Hedland and Cowan vigorously disputed the GAL's factual assertions and recommendations. Hedland asserted that the only reason for the "turmoil" was the Hellén/Cowan attempt to charge an "exorbitant fee." Hedland accused the GAL of doing something Hellén could not in "good conscience" do: an "attempt to renege on the paternity settlement" and an "attempt to void" the Hellén-Cowan agreement. Hedland denied any wrongdoing.
Cowan argued that the settlement agreement which gave a portion of the funds to Carter and Brandon was unenforceable as against public policy given Catrina's paternity and her resulting entitlement to all the proceeds. Cowan also argued theories that might have been an alternative ground for refusing to enforce the 1990 agreement. In affidavits, Brandon and Christy stated they would not have agreed to pay Hedland's "bonus" out of Catrina's share.
The GAL and Cowan each seemed to argue that the September 4, 1990 settlement agreement was not binding on the parties with respect to distribution in the present case; Hedland and Kashi each seemed to argue that the September 1990 order was final and controlling.
At an August 1992 hearing, Judge Link unsuccessfully encouraged the disputants to settle their differences. He noted that Catrina "got something" from the 1990 settlement agreement, including the benefit of preparation for the wrongful death case. The court also stated it was convinced the parties in September 1990 did not feel that the expert testimony resolved all issues of paternity; it noted that the parties to the 1990 agreement were represented by counsel, and it presumed that they had consulted counsel and acquiesced in the agreement.
I do think I have the authority to disturb that agreement. And I have that authority under 90.2 and  in the case law. But, factually, I believe that that agreement was entered into in good faith at the time. And I intend to give to Brandon, Sr. and Carter the substantial benefit that they bargained for in that agreement and, as well, Katrina [sic].
The court also stated that it had not considered any possible ethical violations by the various lawyers except to the extent they affected the reasonableness of the fees charged.
The court then announced a proposed allocation. It proposed giving Brandon $387,274 and Carter $292,127, the amounts they "bargained for in the September 1990 agreement." The court proposed giving Catrina, "the subject matter of all this litigation," $1,839,877, approximately 43% of the gross recovery. The court acknowledged that it was "in some agreement" with the GAL's assertion Catrina's recovery "seems quite low." The court continued: "It is a function, however, of the September 1990 agreement, the agreement which I've indicated under the circumstances, I don't think it would be appropriate to disturb." The court also proposed that the attorney's fees total $1,557,298, and suggested specific allocations to the attorneys and firms. The court further noted that Hedland and Kashi should apportion fees between themselves, and Hellén and Cowan should apportion fees between themselves.
The GAL stated that although Catrina was willing to accept the court's proposal to settle the allocation issues, if other parties appealed, the GAL would consider all issues open on appeal. Hedland and Hellén filed extensive objections to the allocation proposed by the trial court at the August hearing.
In September 1992 the trial court entered an Order Distributing Settlement Proceeds *1307 and a Final Order of Distribution of Minor Settlement Proceeds. The Final Order stated:
Strictly speaking, the court's and counsel's observation [at the September 1990 hearing] that a minor settlement hearing was not necessary to approve the September 1990 agreement between the parties was not accurate. However, the September 4, 1990 hearing was in many respects a minor settlement hearing and all parties have treated the September 1990 settlement agreement as binding since that time.
The trial court characterized the 1990 order as a ratification of the proposed two-thirds/one-third "split" between Catrina and Eric's parents, and announced it was treating the 1990 ratification as a binding order.
Judge Link recognized that Carter and Brandon must have realized there was a substantial probability they would be entitled to recover nothing if Catrina prevailed in the paternity action and Catrina and her attorneys chose to "cut them out." The court called Brandon's ability to share in the recovery "fortuitous." The court stated that much of the "consideration" offered by Carter and Brandon to the 1990 settlement was the preparedness, availability, and ability of "their attorneys" to prosecute the wrongful death action without delay; the court also noted the grandparents' apparent desire to establish a bond with Catrina and the desire of Catrina's mother to cultivate that bond. "Therefore, Brandon and Carter are entitled to the benefit of their bargain."
Judge Link noted the attorneys had requested fees totalling more than 50% of the gross recovery. Recognizing the total sought was clearly excessive, Judge Link decided to award total fees of $1,557,298.02, about 38% of the net recovery.[7] The Final Order allocated the $4.25 million settlement proceeds as follows:

Costs $ 173,421.59
Attorneys Fees:
 Hellén $754,214.23
 Hedland 694,375.03
 Kashi 108,708.76
 ___________
 Total: 1,557,298.02
Catrina (in trust) 1,839,850.65
Brandon 387,274.95
Carter 292,154.79[8]
The Final Order did not discuss the GAL's allegations that attorneys had violated their ethical obligations and that Catrina had accepted the 1990 settlement out of duress.
Hellén, Catrina, and Hedland appealed. We consolidated the three appeals. Partial distributions have been made to Catrina and the attorneys; nothing has yet been distributed to Carter or Brandon.

III. DISCUSSION

A. Standard of Review

We exercise our independent judgment in deciding whether Civil Rule 90.2 applies to particular aspects of a settlement potentially affecting a minor's interests, and if so, whether the proceedings satisfy that rule. Cf. Cedergreen v. Cedergreen, 811 P.2d 784, 786 n. 2 (Alaska 1991) (exercising our independent judgment when reviewing questions involving the legal interpretation of child custody agreement). We review the trial court's findings of fact under a clearly erroneous standard. Alaska R.Civ.P. 52(a). We apply an abuse of discretion standard in reviewing a trial court order approving a settlement of a minor's claims and distributing proceeds of a minor's settlement under Civil Rule 90.2. Cf. Barber v. Barber, 837 P.2d 714, 716 n. 2 (Alaska 1992) (applying the abuse of discretion standard in reviewing trial court's approval of a settlement stipulation). We apply an abuse of discretion standard in reviewing the trial court's allocation *1308 of a total fee award among the attorneys sharing it. AS 09.55.580(a); In re Soldotna Air Crash Litigation, 835 P.2d 1215, 1222 n. 10 (Alaska 1992).

B. The Allocation of Wrongful Death Proceeds

These appeals arise out of the September 1992 orders allocating the Ryan Air wrongful death settlement proceeds. Our decision turns on whether that allocation satisfied the requirements for settling the claims of a minor. As we will see, it did not.
Catrina argues that the 1992 orders erroneously relied on the September 1990 settlement, that the court never approved the 1990 settlement as required by Civil Rule 90.2, that Carter and Brandon should have received nothing, and that the attorney's fees to be paid from the settlement proceeds must be reconsidered and reduced.
Hellén argues that the 1992 allocation erred in awarding insufficient fees jointly to Hellén and Cowan, equal fees to Cowan and Hellén, and excessive fees and costs to Hedland and Kashi.
Hedland argues that the 1992 orders erroneously allocated to Hellén and Cowan $55,000 which should have been paid to Hedland, and thus failed to implement the September 4, 1990 settlement agreement.
Cowan argues that the court erred in allocating any part of the settlement proceeds to Brandon and Carter, in basing any part of the allocations to Kashi, Hedland and Voluck on their contingency contracts with Carter and Brandon, and in reducing the fees Hellén and Cowan should have received jointly per their contingent fee agreement with Catrina's mother.
Carter and Brandon argue that the allocation was essentially appropriate. Kashi argues that his allotted fee should be left undisturbed.

1. Civil Rule 90.2 and minor settlements

Alaska Civil Rule 90.2 sets out the requirements for compromising the claims of a minor.[9] A person claiming on behalf of a minor against another person has the power to execute "a full release or covenant not to sue, or ... a stipulation for entry of judgment on such claim." Alaska R.Civ.P. 90.2(a)(1). Before that document is effective, *1309 however, "it must be approved" by the court. Id.
A person seeking approval must file a petition or motion with the court. Id. Among other things, the petition or motion must "state ... the basis for determining that the settlement is fair and reasonable." Alaska R.Civ.P. 90.2(a)(2). If the settlement arises out of the wrongful death "of another person, the petition or motion must describe the relationship between the other person and the minor and state whether the amount of the settlement is consistent with applicable state law." Id.
The court must approve any attorneys' fees and costs to be paid from the settlement proceeds. Alaska R.Civ.P. 90.2(a)(3). The court must conduct a hearing before approving a settlement if the net proceeds exceed $25,000. Alaska R.Civ.P. 90.2(a)(4).
Although Civil Rule 45(e) gives parties the power to compel the presence of witnesses at hearings, Civil Rule 90.2(a)(4) gives the court authority to compel any person with information "concerning the minor's claim, the fairness of the settlement or any related matter" to attend the settlement hearing. By giving the court authority to require sua sponte the presence of persons whose knowledge may bear on the "fairness" of the settlement, Rule 90.2(a)(4) allows the court to take an active and independent role in the approval process and adduce facts the parties themselves may fail or choose not to produce.
Thus, the rule makes it clear that the trial court cannot approve a proposed minor settlement without first determining that it is "fair and reasonable." Alaska R.Civ.P. 90.2(a)(2). The court may conduct its own investigation of the facts in making that determination and must exercise its independent judgment. Even in the absence of such a rule, it has long been recognized that proposed settlements affecting the interests of minor claimants must be judicially approved to be effective. See Salmeron v. United States, 724 F.2d 1357, 1363 (9th Cir.1983) ("It has long been established that the court in which a minor's claims are being litigated has a duty to protect the minor's interests.... Thus, a court must independently investigate and evaluate any compromise or settlement of a minor's claims to assure itself that the minor's interests are protected....") (citations omitted); Dearing v. Speedway Realty Co., 111 Ind. App. 585, 40 N.E.2d 414, 418-19 (1942); O'Neil v. O'Neil, 271 N.C. 106, 155 S.E.2d 495, 500 (1967).
In Dean v. Holiday Inns, Inc., 860 F.2d 670 (6th Cir.1988), the Sixth Circuit reversed a trial court award of contingent fees to attorneys representing a minor claimant in an action against Holiday Inns. The court noted that a minor is not necessarily bound by a parent's agreement to a contingent fee contract. Id. at 673. It also noted that under Michigan law and the "general rule," "settlement of a minor's claim or agreements or waivers affecting a minor's rights or interests are always subject to approval or amendment by the court with jurisdiction to pass on such agreements or actions." Id. (citing 43 C.J.S. Infants §§ 237-38). "Independent investigation by the court as to the fairness and reasonableness of a fee to be charged against a minor's estate or interest is required." Id. (citation omitted). The court approvingly quoted from Dacanay v. Mendoza, 573 F.2d 1075, 1079 (9th Cir.1978):
It is an ancient precept of Anglo-American jurisprudence that infant and other incompetent parties are wards of any court called upon to measure and weigh their interests.
While the infant sues or is defended by a guardian ad litem or next friend, every step in the proceeding occurs under the aegis of the court.
Dean, 860 F.2d at 673. The Sixth Circuit continued:
The interest of an attorney seeking to be awarded a fee from the settlement proceeds effectuated for a minor must always, by the nature of the relationship and the dependency of the minor, be in tension. When a court is called upon to approve the settlement as is in the best interest of the minor, it must consider and then determine what constitutes fair and reasonable compensation to the attorney regardless of *1310 any agreement specifying an amount, whether contingent or otherwise.
Id. (footnote omitted). The court suggested that "perhaps" the contingent fee agreed upon might be considered "the upper limit of an award." Id. at 673 n. 3.
Civil Rule 90.2 carries out these principles. It requires judicial approval of any proposed settlement that compromises the minor's interests. The court must determine that the terms on which a minor's claim will be compromised are fair and reasonable. That means the court must determine whether the benefit the minor receives is commensurate with what the minor gives up, and must take into account all consideration to be given or received by the minor. When a minor proposes to relinquish a claim, the process of assessing the consideration necessarily requires the court to evaluate the risks and benefits of prosecuting the claim to completion.

2. The 1992 orders allocating settlement proceeds

The court entered the September 1992 orders allocating the settlement proceeds in Case No. 3KN-91-83 PR-MS. That action was filed under Civil Rule 90.2 specifically to approve the proposed Ryan Air settlement and to distribute the settlement proceeds. All parties recognize, at least tacitly, that the estate's 1991 settlement with Ryan Air and the distribution of the settlement proceeds could not be effective without satisfying Rule 90.2 and obtaining court approval.[10] Judge Cranston recognized in September 1990 that court approval would ultimately be required, at least with respect to division of Catrina's share of the proceeds. Judge Cranston's December 1991 order approving the Ryan Air settlement stated that "there shall be no disbursements from the settlement proceeds until further order of this court."
As will be seen, the 1992 allocation was founded on and enforced key features of the 1990 settlement agreement. Because the trial court did not independently review those features in 1992, we must first decide whether the 1990 proceedings satisfied Rule 90.2.

3. The 1990 hearing and agreement

The parties to the September 1990 proposed settlement agreement stipulated "to the full, final and complete settlement of the subject matter of this litigation. ..." (Emphasis added.) The paternity suit was the "litigation" in which the stipulation was offered.
If the stipulation had simply eased Catrina's burden of establishing paternity, Civil Rule 90.2 probably would have been inapplicable. Catrina would have relinquished nothing of value; she could only have benefitted from the procedure which allowed her to establish paternity unopposed by Carter or Brandon.
The 1990 agreement, however, was not limited to the paternity issue. Although it was filed in the paternity case, the 1990 agreement purported to allocate to Carter and Brandon one-third of any recovery the estate might receive in the pending and separate wrongful death suit. The agreement consequently relinquished Catrina's potential claim to receive, as Eric's sole statutory beneficiary, all proceeds in the wrongful death case (subject to claims for fees and costs). AS 09.55.580.[11]See In re Pushruk, 562 P.2d *1311 329, 331 (Alaska 1977) ("[I]f the decedent is survived by a spouse, child or dependent the [wrongful death] action is brought on behalf of the statutory beneficiary and damages are measured by the loss to the survivors.").
When a minor's paternity is in dispute, and that dispute may determine whether the minor receives anything from wrongful death proceeds, the court, before approving a complete or partial relinquishment of the minor's claims to those proceeds, must meaningfully assess the minor's chances of prevailing on the paternity issue. If paternity is virtually certain, the court should not normally permit any distribution that compromises the minor's interests. If, as Catrina argues, Catrina's paternity could not be successfully challenged as of September 4, 1990, the court in 1990 could not allow Carter and Brandon to receive anything; as the sole statutory beneficiary, Catrina would have been entitled to all the wrongful death proceeds.[12] AS 09.55.580(a); In re Soldotna Air Crash Litigation, 835 P.2d 1215, 1220 (Alaska 1992).
On September 4, 1990, the paternity action was on the eve of trial; the parties disputing that issue previously had ample opportunity to investigate and discover the controlling facts. Rule 90.2 required the parties who proposed to divert estate proceeds from the child  potentially the estate's only beneficiary  to produce facts sufficient to permit meaningful judicial assessment of the paternity dispute. The parties failed to do so. They filed no memorandum explaining the factual and legal basis for the proposed settlement. They did not discuss in the stipulation or at the hearing any reason which might have justified court approval of a settlement diverting settlement proceeds from Catrina. Carter and Brandon offered no facts casting doubt on Catrina's paternity. No facts bearing on paternity were offered to the trial court at the September 4, 1990 hearing until after the court had already approved the proposed settlement agreement. The only facts produced at the September 4, 1990 evidentiary hearing supported Catrina's paternity claim, and consequently were inconsistent with paying anything to Carter or Brandon.[13] Assuming there was any genuine dispute about paternity, one would expect that the parties could have given the trial court a candid and possibly confidential assessment of the issue without revealing evidence that would have subsequently aided Ryan Air in defending against the estate's damages claim in the wrongful death action.
The agreement relinquished another claim of potential value to Catrina. Each party agreed in the stipulation to bear its own costs and attorney's fees incurred in the probate and paternity actions. Had she successfully litigated her paternity suit to completion, Catrina might have recovered attorney's fees and costs from Carter and Brandon. Alaska R.Civ.P. 79 & 82(a). Such an award might have been substantial, considering that Hellén *1312 later asserted that Hellén lawyers and paralegals spent 1,589.5 hours and incurred $24,163 in costs in connection with the paternity proceeding. If, as Catrina argues, paternity was essentially indisputable, and any defense to that claim was frivolous, Catrina might have recovered actual fees. Van Dort v. Culliton, 797 P.2d 642, 644 (Alaska 1990) (providing that under Civil Rule 82, the court may award actual fees where the losing party's claim or defense was "frivolous, vexatious or devoid of good faith"). The court was not advised of the potential value of Catrina's claim for costs and fees.
The 1990 agreement also provided that Carter's attorney (Hedland) would receive additional compensation equal to 5% of the net recovery over $612,000. The 5% figure was potentially objectionable because, taken in conjunction with whatever contingent fee contract governed Hellén's and Cowan's attorney's fees, the court could not have known in 1990 whether the total fees charged to Catrina might eventually prove to be excessive. The court was not told of the terms of Hellén's contingent fee agreement. Consequently, in 1990 the court could not approve in the abstract the 5% rate for Hedland's further services.
Moreover, the actual value of Hedland's prospective services was then unknown, both quantitatively and qualitatively. Approving a specific contingent fee percentage in 1990 potentially overcompensated Hedland if there were a large recovery, or if his further services were less extensive or valuable than proposed. The court did not know how much would be recovered from Ryan Air; it seems likely no one anticipated collecting $4.25 million. The verdict was roughly twice what the estate asked from the jury.
Further, notwithstanding the seeming simplicity of the 1990 agreement, it is doubtful the parties themselves fully understood how it might affect attorney's fees awards. To ensure that a child's interests are not unfairly compromised in such a case, the trial court must make careful and rigorous inquiry even when experienced and capable attorneys are involved.
The trial court may have found that the agreement  which obliged Christy to "endeavor to facilitate a reasonable and enduring relationship" between Catrina and her grandparents, Carter and Brandon  gave Catrina something of value. Given a proper fact showing, a court might determine that such an undertaking is sufficiently valuable to justify a minor's relinquishment of a valuable claim. In this case, however, the parties did not offer the facts necessary to permit such a determination.[14]
Because the proposed 1990 settlement resolved or compromised claims of potential value to Catrina, the parties were required to satisfy Rule 90.2 when they sought judicial approval in 1990. They failed to do so. Their total failure to discuss any factual basis for determining that the settlement was "fair and reasonable" deprived the court of the facts necessary to decide whether to approve the proposed settlement. Alaska R.Civ.P. 90.2(a)(2).
The circumstances at the time of the 1990 settlement help explain why the court did not follow Rule 90.2 or conduct the required hearing. No attorney suggested that the court do so, and no party made the motion and factual showing required by Rule 90.2. The proposal was submitted on the eve of the scheduled paternity trial without any substantive explanation, and during the short hearing, the attorneys did nothing to correct the court's erroneous belief that Rule 90.2 did not apply to the proposed agreement.[15]
*1313 The court did not remedy the parties' failure, nor did the 1990 hearing substantially satisfy Rule 90.2. There is no indication the court considered the substance of the proposed settlement terms in 1990. In sum, the September 4, 1990 order cannot be considered the substantive judicial approval contemplated by Rule 90.2.

4. The 1992 proceedings

The 1992 allocations fundamentally relied on the 1990 agreement in calculating the distributions to Carter and Brandon and to attorneys whose services benefitted them. In 1992 the court did not independently review any of the matters that should have been considered before the September 1990 agreement was approved. Although the trial court correctly recognized in 1992 that the attorneys and the court had erred in 1990 in thinking that no hearing was required to approve the 1990 agreement, it nonetheless decided that the 1990 hearing was "in many respects" a minor settlement hearing and that all parties had treated the settlement as binding since that time. Consequently, it gave Brandon and Carter the benefit of their 1990 bargain. It also gave effect to other aspects of the 1990 agreement, particularly the term giving Hedland additional compensation.
However, as seen above, the 1990 hearing did not satisfy Rule 90.2 and did not remedy the deficiencies in the procedure followed by the parties.
Contrary to the assertion of some parties, the parties' treatment of the 1990 settlement as "binding" until 1992 could not obviate its infirmity. The failure to observe the requirements of Rule 90.2 disposes of these assertions. Independent judicial scrutiny is required precisely because of the possibility that a settlement agreement will not be in a minor's best interests, notwithstanding the active involvement of capable and responsible counsel and representatives, and their approval of a proposed settlement. Consequently, the active involvement of Christy Crume and Hellén in the 1990 settlement cannot excuse the failure to follow Rule 90.2 in 1990 or to consider the 1990 settlement terms in 1992. Further, the allocation issues did not arise until the estate settled with Ryan Air in December 1991, and until the GAL was appointed in 1992, there were no changes in the parties and representatives who had found the terms acceptable in September 1990.
The 1992 proceedings did not independently satisfy Rule 90.2. The court never considered in 1992 whether the 1990 agreement was valid. Nor did it consider the fundamental question of whether Carter and Brandon were entitled to receive anything, given the high probability in 1990 that Catrina was the estate's only statutory beneficiary. The court did not determine the proper value to be placed on any amount Carter and Brandon were to receive, assuming they could receive anything. It did not consider the wisdom of other terms of the 1990 agreement, such as Catrina's relinquishment of any claim for attorney's fees or costs she incurred in the paternity suit.
The parties did not provide Judge Link with the facts necessary to justify sharing the proceeds with the parents. They produced no evidence that would have permitted the court in 1992 to decide either that Catrina's paternity was in genuine dispute in 1990 or that the one-third share allocated to Brandon and Carter fairly reflected the value of avoiding trial on paternity.[16]
To the extent the court in 1992 discussed any facts bearing on the settlement, those facts do not necessarily justify approval of *1314 the 1990 settlement terms or the 1992 allocation. For example, comments in the 1992 allocation order about the frailty of Carter's and Brandon's claims tend to support a conclusion that it was improvident to agree to give them one-third of any recovery. The allocation order also noted that the strength of the parents' claim to a share of the proceeds lay in "the preparedness, availability and ability of their attorneys (particularly the Hedland Firm) to prosecute the wrongful death action without delay." These factors support the GAL's objections to the allocations because the attorneys' cooperation was ethically required and could not justify diverting part of the proceeds to persons potentially entitled to receive nothing. See infra discussion at part 5a. Nor could Carter and Brandon, the estate's co-personal representatives, properly do anything (such as encouraging Hedland to withdraw) to prejudice the estate's claim against Ryan Air. See Alaska Bar Association Ethics Opinion 91-2 (1991) at 2 ("A personal representative in Alaska is under a duty to settle and distribute the estate of the decedent in accordance with the ... applicable statutes ... as is consistent with the best interests of the estate. The authority conferred by the statutes and court orders must be used by the personal representative for the best interests of the successors of the estate."). See also infra note 21.
In sum, the court in 1992 did not make the inquiry or fact findings required to determine whether the 1992 allocations were fair and reasonable. The court could have done so only by considering the substance and effect of all aspects of the September 1990 agreement which potentially disadvantaged Catrina. Because the 1990 agreement never received the scrutiny required by rule, the court erred in relying on that agreement to calculate the final distribution of the Ryan Air settlement proceeds in 1992. We must consequently reverse and remand.
It will be necessary on remand to decide whether Carter and Brandon should receive any settlement proceeds.[17] If the trial court concludes on remand that as of September 4, 1990, Carter and Brandon had no hope of defeating Catrina's paternity claim, they would not be entitled to share in the Ryan Air recovery unless they also agreed to contribute valuable consideration to the September 1990 settlement. If the trial court concludes that Carter and Brandon could have demonstrated that they had a more-than-negligible chance of defeating Catrina's paternity claim, it should attempt to quantify the value of that chance in assessing the fairness of the 1990 proposed allocation.[18]

*1315 5. Additional concerns identified in 1992

In 1992 some parties raised additional concerns (possible ethical and fiduciary violations, fee splitting and duress) that might have affected the allocation. The court did not give them substantive consideration. It should do so on remand. By remanding, we are not holding that any attorney or party engaged in impropriety or breached ethical or fiduciary duties. Because the allegations raising these concerns were not patently insufficient, the trial court should have considered them when allocating the settlement proceeds, and must do so on remand.

a. Alleged ethical violations and conflicts

Carter retained Hedland and Brandon retained Kashi to bring claims resulting from Eric's death. When Carter and Brandon became the estate's co-personal representatives, Hedland and Kashi jointly represented the estate in the wrongful death action. When Catrina filed her paternity claim against Carter and Brandon, Carter retained Hedland and Brandon retained Kashi to respond to Catrina's claim.
The GAL and Hellén argue on appeal that Hedland and Kashi had two conflicting duties: (1) as attorneys for the estate, they had a duty to act in the best interests of the estate's ultimate beneficiary, whomever it might prove to be; but (2) as attorneys for Carter and Brandon in the paternity action, they had a duty to represent Carter and Brandon as defendants in Catrina's paternity suit. The GAL and Hellén claim Kashi and Hedland were in a conflict position because establishment of Catrina's paternity would also establish the ineligibility of Brandon and Carter to receive any part of the Ryan Air damages. The GAL and Hellén also note that in 1988 the court imposed a duty on Carter and Brandon, as co-personal representatives of the estate, to determine Eric's heirs and Catrina's paternity. The GAL and Hellén assert that if we conclude that there was a conflict of interest which should have disqualified Hedland and Kashi from representing the estate, Hedland and Kashi should be denied any fees. Hedland vigorously argues that there was no breach and that, moreover, the GAL's allegations of impropriety were factually unsupported.
Judge Link did not consider the effect of any possible ethical violations except to the extent they might have affected the reasonableness of fees charged.
Disciplinary Rule 5-105, in effect at the time of the litigation, provided in part:
(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C).
(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105(C).
(C) In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.
Ethical Consideration (EC) 5-14, also in effect when the paternity and wrongful death actions were proceeding, prohibits a lawyer from representing "two or more clients who may have differing interests, whether such interests be conflicting, inconsistent, diverse, or otherwise discordant." When considering whether multiple clients have differing interests, the lawyer must "resolve all doubts against the propriety of the representation." EC 5-15. If a lawyer accepts representation where multiple clients have potentially differing interests, when the interests actually become differing, the lawyer "would have to withdraw from employment." Id.
Although this court has not previously decided whether representation of both the beneficiary and the personal representative of the estate constitutes an impermissible conflict of interest, the Oregon Court of Appeals *1316 addressed the issue in Kidney Association of Oregon, Inc. v. Ferguson, 97 Or. App. 120, 775 P.2d 1383 (1989), modified on reconsideration, 100 Or. App. 523, 786 P.2d 754 (1990). In Kidney Association, the appellate court concluded that although there was no actual conflict between the interests of the beneficiary and the interests of the personal representative and no reasonable expectation of a divergence of interests when representation began, the parties' interests later diverged. 775 P.2d at 1386; 786 P.2d at 756. The court held that when the interests diverged, the attorney "was under an ethical obligation to notify [the beneficiary] and the estate of a likely conflict of interest and obtain their consents to his continued representation of them." 786 P.2d at 757. By failing to do so, the attorney "breached his fiduciary duty to [the beneficiary]." 775 P.2d at 1386. Such a breach potentially impacts an attorney's right to fees. Moses v. McGarvey, 614 P.2d 1363, 1372 (Alaska 1980).
The GAL and Hellén correctly assert that Hedland and Kashi's dual responsibilities were in potential conflict. It appears Carter and Brandon knew from the outset that there was potentially a minor heir. The record before us supports a claim that no later than mid-April 1988, Hedland and Kashi knew that a minor child might be Eric's only heir, and that the child's paternity would make Carter and Brandon ineligible to receive any wrongful death proceeds. If so, Hedland and Kashi should have recognized that Carter and Brandon had interests potentially at odds with those of the minor child, and that Carter and Brandon, as representatives of the estate, might have a personal interest in failing to perform their duty to ascertain the estate's heirs per Judge Cranston's December 1988 order. Carter and Brandon bargained for settlement terms in 1990 that were potentially disadvantageous to Catrina. The personal representatives of the estate thus arguably benefitted at the expense of the person who was probably the sole beneficiary of the estate. Consequently, we cannot say as a matter of law that no conflict of interest existed.
When an attorney undertakes to perform legal services for a client who is acting in a fiduciary capacity, the attorney has a duty not to affect adversely the interests of the intended beneficiary. Fickett v. Superior Court of Pima County, 27 Ariz. App. 793, 558 P.2d 988, 990 (1977); see also Jenkins v. Wheeler, 69 N.C. App. 140, 316 S.E.2d 354, 357 (1984) ("When a client merely represents a class of beneficiaries, the attorney should consider the beneficiaries' interests, without undue concern for the interests of the legal representative.").
Hedland argues that Alaska Bar Ethics Opinion 91-2 refutes any argument that Hedland and Kashi engaged in unethical conduct. Ethics Opinion 91-2 holds that an attorney who represents the personal representative in the probate of an estate is not per se precluded from also representing the personal representative in a contest with other heirs if the attorney has gained no relevant confidential information from the other heirs while acting for the personal representative. Id. at 2.
Ethics Opinion 91-2 would not excuse the attorneys' alleged actions in this case. While acting as attorneys for the estate, Hedland and Kashi allegedly gained a valuable advantage over Catrina because they were intimately familiar with the wrongful death action and were the only attorneys adequately prepared to try that case as of September 1990. They and Carter and Brandon had allegedly prevented Catrina's mother from becoming an additional co-personal representative and resisted efforts by Catrina's attorney, Hellén, to relieve them or take an active role in the wrongful death case in time to prepare sufficiently to try that case on the scheduled date. The GAL alleged that Hedland and Kashi used that advantage against Catrina in negotiating a settlement that was favorable to Carter, Brandon, and themselves. Ethics Opinion 91-2 consequently does not apply here.
The trial court never considered whether there were ethical violations and, if there were, whether they affected the settlement. The record is consequently incomplete. As a result, we are unable to say as a matter of law that there was no conflict or that Catrina's interests were not harmed. Given the possibility that a conflict disadvantaged Catrina, *1317 the trial court on remand must decide whether Hedland and Kashi entered into a conflict position and if so, whether they did so intentionally. The court must also consider whether they used their positions as attorneys for the estate to disadvantage Catrina during negotiation of the 1990 settlement terms.
In Alaska, the general rule has been that once a conflict of interest or other ethical violation has been established, the attorney is prohibited from collecting fees for his or her services. Moses, 614 P.2d at 1372 ("It is well established that an attorney, disqualified on conflict-of-interest grounds, generally is barred as a matter of public policy from receiving any fee from either of the opposed interests."). However, in Kidney Association, the Oregon court expressly rejected the "majority" view articulated in Moses. Kidney Association, 775 P.2d at 1386-87. It instead favored a "case-by-case approach" that would weigh all relevant factors in determining whether attorneys are entitled to the reasonable value of their services. Id. at 1387. In a case-by-case determination, the court is to consider, among other factors, whether the breach was intentional and whether the attorney's conduct prejudiced the client. Id.[19]
Given the incomplete record, the absence of findings, and the apparent presence of genuine fact disputes, it is premature to decide whether we should apply the general rule expressed in Moses. On remand, if the trial court finds that an attorney was in a conflict of interest, it should apply Alaska law when allocating attorney's fees. However, it should also make alternative fact findings under Kidney Association to reduce the chances of a second remand following any further appeal.
Unless the trial court concludes that Hedland and Kashi are prohibited from receiving fees earned by them, the court should also consider, when allocating attorney's fees, whether Hedland and Kashi, by contesting the paternity issue for Carter and Brandon or allegedly prolonging that dispute (1) caused Catrina and the estate to incur needless litigation expense; or (2) inappropriately prevented Hellén and Cowan from participating in the wrongful death action in time for them to have become the exclusive attorneys for the estate after September 4, 1990. Additionally, the superior court should consider that Hedland and Kashi, through their diligence and advocacy, greatly contributed to the ultimate success of the wrongful death action, and to collection of a post-judgment settlement substantially exceeding Ryan Air's insurance limits.[20]

b. Fee splitting

Fee-splitting agreements existed between Hellén and Cowan, between Kashi and Hedland, and between Hedland and Voluck. The GAL argues that these agreements may have diverted settlement proceeds from Catrina to attorneys who did not earn their fees. Hellén also argues that Judge Link erred in not resolving the fee-splitting issue, and that Hellén is entitled to a greater share of the *1318 fee than Cowan, who allegedly did not perform an equal share of the work.
Alaska Disciplinary Rule 2-107(A), which was in effect at the time of the litigation, provides:
(A) A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of his law firm or law office, unless:
(1) The client consents to employment of the other lawyer after a full disclosure that a division of fees will be made.
(2) The division is made in proportion to the services performed and responsibility assumed by each.
(3) The total fee of the lawyers does not clearly exceed reasonable compensation for all legal services they rendered the client.
DR 2-107(A). Similarly, Ethical Consideration 2-22 provides in part:
A fee may properly be divided between lawyers properly associated if the division is in proportion to the services performed and the responsibility assumed by each lawyer and if the total fee is reasonable.
In context of a minor settlement involving multiple attorneys, a fee-splitting division can overcompensate an attorney whose share exceeds the reasonable compensation for the attorney's services. Such overcompensation is potentially at the minor's expense. A court reviewing a minor settlement under Rule 90.2 must consequently confirm that a fee-splitting agreement does not lead to an excessive fee award. Alaska R.Civ.P. 90.2(a)(3). The court must first determine that the services performed by each attorney were in proportion to the agreed division and that the total fee does not clearly exceed reasonable compensation for the services rendered. DR 2-107(A)(2), (3). If so, the court should divide the fees accordingly.
The record does not contain sufficient evidence for us to resolve any question about the propriety of the fee-splitting agreements or divisions made pursuant to them. On remand, the trial court must consider the fee-splitting agreements to determine that they have not resulted in diverting settlement proceeds inappropriately from Catrina. McNeary v. American Cyanamid Co., 105 Wash.2d 136, 712 P.2d 845, 848 (1986) (providing the trial court is the appropriate place to resolve a dispute between two firms regarding the division of a contingency fee).

c. Duress

The GAL alleged in 1992 that she had "been advised" that Hedland, during the discussions that led to the September 4, 1990 agreement, threatened to withdraw from the wrongful death case (at a time when he was the only attorney arguably prepared to be lead trial counsel in that case) unless Catrina agreed to pay him additional compensation beyond his share of Carter's recovery. The GAL supported that assertion with her own affidavit, but it does not appear that the GAL was speaking from first-hand knowledge. Attorney Cowan filed an affidavit, potentially based on first-hand knowledge, in which he affirmed that he could "confirm the conduct cited by the [GAL] in the report in regard to threats to not cooperate and threats to appeal and drop out the paternity litigation...." Christy Crume offered an affidavit which asserted that she had been under no duress. Hedland denied making any threat.[21]
Judge Link did not consider whether the September 1990 agreement was the result of duress or whether Hedland made any threat to withdraw. Instead, the court tacitly recognized that Catrina was potentially faced with trying the wrongful death action without the assistance of Hedland: "I am *1319 cognizant of the fact that much of the `consideration' Carter and Brandon had to offer in that agreement was the preparedness, availability and ability of their attorneys (particularly the Hedland Firm) to prosecute the wrongful death action without delay." Consequently, the court concluded that Carter and Brandon were "entitled to the benefit of their bargain."
Given the record, we cannot say as a matter of law that the claim of duress is without merit. On remand, the court should consider the duress claim. If it finds Catrina acted out of duress, the court would be compelled to conclude that the 1990 agreement did not satisfy Rule 90.2. Duress would also render that agreement unenforceable apart from any Rule 90.2 determination. "If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract...." Vockner v. Erickson, 712 P.2d 379, 381 (Alaska 1986) (quoting Restatement (Second) Contracts § 208 (1981)).

6. Potentially excessive fees

In 1990, the trial court did not consider whether the September 1990 agreement and the existing contingent fee agreements might lead to excessive fees. In 1992, Judge Link recognized that the total fees requested by all the attorneys, exclusive of costs, were clearly excessive because they exceeded 50% of the gross recovery. Judge Link consequently calculated a total fee of $1,557,298. See note 7, supra. That total was approximately 38% of the net recovery.
Civil Rule 90.2(a)(3) requires judicial approval of attorney's fees and costs to be paid from a minor's settlement proceeds. The potential for excessive fees is greater when several attorneys, each operating under a separate contingent fee agreement, ask the court to order the minor to pay attorney's fees based on those agreements. Generally, an attorney's fees calculation is addressed to the discretion of the trial court. Hickel v. Southeast Conference, 868 P.2d 919, 924 (Alaska 1994) (affirming Rule 82 award). The total fee to be charged against a minor's recovery is likewise addressed to the discretion of the trial court.
In our view, the total fee award is potentially excessive given all the circumstances presented here. Because the general failure to comply with Civil Rule 90.2 requires remand and recalculation of all the allocations, the issue of excessive fees may not resurface, and the factors which make the fee total appear excessive may not be repeated.
If Catrina were the only recipient of the damages distribution, the fees total would potentially be within the discretion accorded the trial court.[22] As a result of the allocation to Carter and Brandon, however, Catrina's net recovery ($1,839,850) was only 45% of the net settlement proceeds ($4,076,578), and the fees total calculated by the court in 1992 ($1,557,298) was 89% of the net amount Catrina was to receive. A considered conclusion on remand that Carter and Brandon had a legitimate claim to a portion of the proceeds would permissibly alter the portion available for distribution to Catrina, as well as the amount available to compensate the attorneys whose services benefitted her. If Carter and Brandon share in the proceeds on remand, they must fairly contribute to the amount available to compensate attorneys whose efforts mutually benefitted all the plaintiffs.[23]

*1320 C. Procedural Issues

Hedland, Kashi and Brandon argue, in essence, that we cannot review the terms of the 1990 settlement because the 1990 order was a final, negotiated settlement that was never appealed and because the GAL never moved to set it aside under Civil Rule 60(b).
There is no procedural impediment to reaching the issues previously discussed in this opinion. The 1990 settlement could not be a final judgment with respect to allocation issues because it was not the final order of distribution, and consequently, could not terminate the child's interests. See Alaska R.Civ.P. 90.2(a)(5) ("No instrument executed under this rule is effective to terminate a minor's interests until such funds are paid as directed by the court."). Because the 1990 order was not a final judgment as to any issue other than paternity, the doctrine of res judicata did not prevent the trial court from considering the allocations issue afresh in 1992, or require it to apply and enforce all terms of the 1990 agreement. Likewise, without a final judgment, we are not precluded when considering the 1992 allocations from reviewing the 1990 settlement enforced by the 1992 orders. The 1990 agreement purported to do much more than resolve the paternity dispute which was the real subject of that lawsuit. It also allocated the potential, unliquidated proceeds of a totally separate lawsuit which was still in progress. The requirements of Rule 90.2 cannot be circumvented by enforcing the terms of an agreement reached previously but never subjected to judicial scrutiny.

D. Attorneys' Appeals

Hellén argues on appeal that the trial court erred in awarding $754,214 to Hellén and Cowan, 28% of their client's net recovery, rather than $1,087,087.58, the 40% fee specified in their contingent fee contract. Hellén and Cowan also argue that the trial court granted excessive fees to Hedland, Kashi and Voluck. Hedland also appeals from the fee award and argues that he was undercompensated by $55,000.00 because the trial court did not fully enforce the 5% provision in the 1990 settlement.
Given our resolution of the issues previously discussed, and the probability that the amounts allocated will change following remand, it is unnecessary for us to decide whether the trial court erred in calculating the 1992 allocations for the various attorneys.

IV. CONCLUSION

Because the 1992 orders allocating the Ryan Air settlement proceeds did not give the scrutiny required by Civil Rule 90.2 to all aspects of the settlement potentially affecting Catrina, and instead fundamentally relied on 1990 settlement terms which never received the scrutiny required by Civil Rule 90.2, the judgment of the superior court is REVERSED. The superior court is directed on remand to conduct further proceedings consistent with this opinion.[24]
MATTHEWS, J., not participating.
NOTES
[1] Carter denied disputing Catrina's paternity.
[2] Ryan Air had filed for Chapter 11 bankruptcy. Eric's estate was one of Ryan Air's creditors. Through Hedland, Carter filed Catrina's genetic blood testing report in Ryan Air's bankruptcy proceeding to demonstrate the value of the estate's claim against Ryan Air. The accompanying June 14, 1990 affidavit of Hedland attorney Sara Heideman stated that the firm conducting the genetic testing had determined there was a "99.99% likelihood" that Eric was Catrina's father. Hedland himself affied in 1992 that the attorneys for Carter and Brandon in the paternity case had concluded after receiving the genetic testing results in June 1990 that it was a "virtual certainty" Christy's mother would prevail in the paternity case based on the genetic test results then available. Independent tests conducted for Brandon and Carter later confirmed the results of the tests conducted for Catrina.
[3] The evidence supporting Catrina's paternity claim was substantial. Christy Crume testified that (1) she had frequent sexual relations with Eric and no other man during the time Catrina was conceived; (2) Eric, on learning of the pregnancy, admitted to her the child was his; (3) Eric accompanied her to the hospital when she went into labor; (4) she named Eric as the father in a standard news release following the birth and on the card bearing the baby's footprints; (5) after she went home, Eric was around; (6) photographs depicted Eric holding Catrina; (7) Eric referred to himself as Catrina's "papa," held her frequently, changed her diapers, and bought her a Christmas present; (8) Eric gave Christy cash to pay utilities on the trailer where she lived.

Six witnesses testified under oath that Eric had acknowledged that he was Catrina's father. Three testified he had done other things consistent with fatherhood. One witness testified that she had seen Eric buying food, diapers, an outfit and a rattle inscribed "My Girl." Another testified that Eric referred to Catrina as "daddy's little girl." Another testified that "just about everybody you talked to that knew him knew it was his."
Dr. Geyer, a clinical immunologist, testified that he is associated with a laboratory that conducts tests in disputed paternity cases across the country and around the world. He explained the testing which had been conducted at his direction and the nature of blood testing and DNA profiling. He testified that the rarity of the blood groups permits a calculation of the combined paternity index, which states as a probability that the decedent is the true father of the child based strictly on the scientific evidence. He testified that as calculated, the probability was 99.99% that Eric was Catrina's father, and based on the scientific studies, he believed there was "a reasonable scientific certainty" Eric was Catrina's true biological father. Catrina's attorney was prepared to call a second expert, Dr. Beaver, to discuss the scientific reliability of the test when applied to Catrina's paternity, but the court appeared to indicate Dr. Geyer's testimony was sufficient.
[4] The appellate record discusses several circumstances that, if proven by competent evidence, might have supported a conclusion Eric was not Catrina's father. Christy Crume on one occasion may have prepared a document naming someone other than Eric as Catrina's father; the birth certificate did not name Eric as the father; Eric had refused a blood test; Eric had denied paternity when the State of Alaska inquired about child support based on Christy Crume's assertion he was Catrina's father. Additionally, Kashi submitted an affidavit in 1992 which described several circumstances that, if proven, might have raised a genuine fact dispute about Catrina's paternity claim. Despite these possibilities, the record contains no evidence (documents, testimony, affidavits based on personal knowledge) submitted to either Judge Cranston in 1990 or Judge Link in 1992 that would have created a genuine dispute about paternity.
[5] For continuing to participate in the wrongful death suit, Hedland's "additional compensation" was to be, per the September 4, 1990 agreement, 5% of the difference between the net settlement proceeds and $612,000, the last amount offered by Ryan Air as of September 4, 1990.
[6] The GAL proposed this fees allocation:

Attorney Time Expended Percentage Amount
Hellén 3,303.8 hours .40 $566,610
Hedland 3,628.8 .44 623,271
Kashi 693.8 .08 113,322
Cowan 693.8 .08 113,322

[7] Judge Link calculated the total by allowing contingent fees of 33-1/3% on the first $1,100,000 (the amount of the available insurance limits) and 40% on the remaining amount ($2,976,578.41) of the net settlement. The court justified the enhanced percentage by the difficulty of obtaining and enforcing the judgment.
[8] The court in 1992 allocated a total of one-third of the net proceeds of the Ryan Air settlement to Carter and Brandon and their attorneys, in accordance with the 1990 settlement agreement. Net of the fees allocated to their attorneys, Carter and Brandon were to receive a total of approximately $679,429. The remainder of their one-third share of the net settlement proceeds was to be distributed to their attorneys.

Hellén and Cowan were to share the amount allocated to Hellén; Hedland and Voluck were to share the amount allocated to Hedland.
[9] Civil Rule 90.2(a) provides:

(a) Approval of Settlement of Claims on Behalf of Minors.
(1) Approval. A parent or guardian of a minor who has a claim against another person has the power to execute a full release or a covenant not to sue, or to execute a stipulation for entry of judgment on such claim. However, before such a document is effective, it must be approved by the court upon the filing of a petition or motion.
(2) Petition or Motion. A petition or motion for court approval of a minor's settlement under this rule must state the date of birth of the minor, the relationship between the moving party and the minor, the circumstances giving rise to the claim, the amount of any applicable liability insurance, and the basis for determining the settlement is fair and reasonable. If the settlement arises from personal injuries to the minor, the petition or motion must describe the extent of the injuries, the medical treatment provided and the probable future course of treatment. If the settlement arises from the wrongful death or injury of another person, the petition or motion must describe the relationship between the other person and the minor and state whether the amount of the settlement is consistent with applicable state law.
(3) Attorneys' Fees and Costs. The court shall approve any attorneys' fees and costs that are to be paid from the settlement proceeds when the minor claimant is represented by counsel.
(4) Hearing. The court may approve the minor's settlement without a hearing if the settlement proceeds, after attorney's fees and costs are deducted, do not exceed $25,000. When a hearing on the petition or motion is held, the court may require the presence of any person that has information concerning the minor's claim and the fairness of the settlement or any related matter.
(5) Termination of Minor's Rights. No instrument executed under this rule is effective to terminate a minor's interests until such funds are paid as directed by the court.
Civil Rule 90.2 became effective August 1, 1987. It is similar to a practice adopted by the superior court judges for the Third Judicial District on October 31, 1972. Supreme Court Order No. 835, which adopted Civil Rule 90.2 for Alaska, expressly superseded the 1972 special order adopted for the Third Judicial District. SCO No. 835 ¶ 2. An equivalent practice had also been followed in the First Judicial District before Rule 90.2 was adopted. Letter from Judge Thomas E. Schulz, First Judicial District (Nov. 29, 1982) (on file with court rules attorney).
[10] The memorandum seeking court approval of the proposed Ryan Air-estate settlement in 1991 satisfied Rule 90.2. After conducting a hearing at which counsel explained the reasons for the settlement, Judge Cranston approved that settlement on December 5, 1991, permitting the estate to receive $4.25 million. No one suggests the 1991 Ryan Air settlement did not satisfy Rule 90.2.
[11] AS 09.55.580(a) provides:

[W]hen the death of a person is caused by the wrongful act or omission of another, the personal representatives of the former may maintain an action therefor against the latter, if the former might have maintained an action, had the person lived, against the latter for an injury done by the same act or omission. The action shall be commenced within two years after the death, and the damages therein shall be the damages the court or jury may consider fair and just. The amount recovered, if any, shall be exclusively for the benefit of the decedent's spouse and children when the decedent is survived by a spouse or children, or other dependents. When the decedent is survived by no spouse or children or other dependents, the amount recovered shall be administered as other personal property of the decedent but shall be limited to pecuniary loss. When the plaintiff prevails, the trial court shall determine the allowable costs and expenses of the action and may, in its discretion, require notice and hearing thereon. The amount recovered shall be distributed only after payment of all costs and expenses of suit and debts and expenses of administration.
[12] In cases in which the issue of paternity is in doubt, the decedent's parents and the minor claiming to be the decedent's child might well reach a compromise which would fairly and reasonably give the parents a significant or even predominant portion of the estate proceeds. In appropriate circumstances, a court might approve such a compromise after first determining that it is fair and reasonable.
[13] The blood test results potentially created a presumption of paternity that could have been rebutted only by clear and convincing evidence. See AS 25.20.050(d) ("The results of a blood test ... shall be admitted and weighed in conjunction with other evidence in determining the statistical probability that the putative parent is a legal parent of the child in question. However, a scientifically accepted procedure that establishes a probability of parentage at 95% or higher creates a presumption of parentage that may be rebutted only by clear and convincing evidence"); see also Smith v. Smith, 845 P.2d 1090, 1092 (Alaska 1993) (attaching presumption of paternity where blood test indicated 99.59% of likelihood that the husband was the child's father). Neither the parties nor the court discussed AS 25.20.050(d) or the clear and convincing standard of proof in the 1990 stipulation or hearing. At the hearing, the court did not discuss whether the test results (based on blood samples from Catrina and Carter and Brandon, rather than Catrina and Eric) satisfied the statute and gave rise to the presumption.
[14] Although in 1992 the court seemed to consider this element of the 1990 agreement to be valuable consideration to Catrina, we note that it imposes a unilateral obligation on Catrina's mother and imposes no express duty on Carter and Brandon.

In assessing this settlement term, a trial court might consider whether love and affection can be negotiated and purchased, or whether, assuming Carter and Brandon were genuinely able to provide love and affection to Catrina, the consideration to be given by Catrina was equitable.
[15] On appeal, Hedland asserts that the 1990 proposed agreement was presented to court for its review and approval "pursuant to Civil Rule 90.2." That assertion is incorrect, and is also contrary to the position Hedland took at the 1990 hearing. At that hearing, Hedland advised the court that he did not believe a minor settlement procedure was necessary for the agreement then proposed to Judge Cranston, although the attorneys and the court all contemplated that any future settlement of the minor's claims would be subject to a Rule 90.2 approval. Hedland also stated that the "substance of this agreement wouldn't be open for consideration" at any subsequent proceeding.
[16] Several attorneys submitted affidavits and memoranda in 1992 alleging some facts potentially bearing on paternity. See note 4, supra. Those submissions provided only hearsay accounts of the circumstances alleged and could not rebut the strong evidence of paternity admitted at the September 4, 1990 hearing. Given the inadmissibility of the submissions, they would not have justified a conclusion in 1992 that Catrina's paternity was in genuine dispute in 1990.
[17] We recognize the dilemma faced by the parties to the paternity action in September 1990. If Catrina's paternity remained unestablished, the damages potentially recoverable in the wrongful death action would have been relatively modest, and almost certainly within the insurance limits. Finding that Eric was Catrina's father would maximize the claim against Ryan Air, but would be inconsistent with a recovery by Carter and Brandon. The parties attempted to resolve this dilemma on September 4, 1990, and under the circumstances, the fairness of that agreement must be considered in light of the information then available.

The record suggests that the evidence of paternity was overwhelming in 1990. Although Carter and Brandon may have made a tactical choice to offer no contrary evidence at the paternity hearing, the 1992 allocation disputes provided the parents ample opportunity to memorialize any evidence of non-paternity to support a conclusion it was fair to give Carter and Brandon a share of the proceeds. Significantly, the record contains no admissible evidence that would provide any substantial rebuttal to the strong evidence of paternity. See notes 4, 16.
[18] For example, if the court concludes Carter and Brandon had a legitimate 20% chance of defeating Catrina's paternity claim, and the probable recovery for the estate was $800,000 in the absence of any statutory beneficiary such as Catrina, the total value of the parents' contingent claim would be $160,000. Because a larger recovery from Ryan Air would necessarily require evidence of a statutory beneficiary (i.e., proof of Catrina's paternity), and because that evidence would also render Carter and Brandon ineligible to share in the proceeds calculated on an assumption Catrina was Eric's heir, the parents would not be entitled to any contingent part of the larger recovery.

This type of calculation will assist the court in determining whether the parents received more than they should have for their contingent claim. Note that Ryan Air's highest offer was $612,000 as of September 4, 1990, and that Carter and Brandon had indicated a willingness to settle for $820,000 at a time when paternity had not yet been resolved by settlement or court order. The court on remand may have to calculate the probable value of the wrongful death claim if prosecuted for the sole benefit of the parents.
[19] In Garrick v. Weaver, 888 F.2d 687 (10th Cir.1989), Roberta Garrick was driving one of the automobiles involved in a collision. Littlepage, a passenger in Garrick's car, was killed. The attorney represented Garrick and her two minor children as well as the estate of Littlepage in their suit against the other driver. There was a conflict between the interests of the Garricks and the Littlepage estate because Garrick was potentially liable to the estate. The attorney informed Garrick and the representatives of the estate of the conflict of interest, but inadequately outlined to Garrick the ramifications of the conflict. Following recovery of damages, the magistrate did not altogether deny fees to the attorney, but based the fees on the value of the services rather than on the contingent fee contract. On appeal, the Tenth Circuit held that it could not say the magistrate abused his discretion in so ruling. Id. at 691.
[20] The parties have frequently remarked on the excellent result the attorneys achieved for the estate. Judge Link properly recognized the "magnificent" legal efforts which maximized the estate's recovery, especially considering the modest insurance limits and Ryan Air's financial condition. The estate's success may be measured by comparing its $4.25 million net recovery with the amount allegedly recovered by the estate of another passenger with two dependent surviving children: $900,000. Nonetheless, the quality and success of that representation cannot justify affirmance of awards that have not been given the scrutiny required by Rule 90.2 and that may have treated Catrina unfairly and unreasonably.
[21] Threatening to withdraw from a wrongful death case shortly before trial would potentially violate DR 2-110(A)(2). Such a violation could have a bearing on attorney's fees. DR 2-110(A)(2) provides:

(A) In general.
....
(2) In any event, a lawyer shall not withdraw from employment until he [or she] has taken reasonable steps to avoid foreseeable prejudice to the rights of his [or her] client, including giving due notice to his client, allowing time for employment of other counsel, delivering to the client all papers or property to which the client is entitled, and complying with applicable laws and rules.
[22] A court could conclude that there was no reason in this case for an additional incentive beyond the base contingent rate, because the attorneys would not need the incentive of an incremental increase in the contingency rate to pursue a recovery exceeding the insurance limits. (Although Catrina's mother agreed to pay Hellén and Cowan a 40% contingent fee for services through trial, the estate agreed to pay Hedland and Kashi a 30% contingent fee.) A court could conclude that the typical one-third contingent fee arrangement provides ample incentive to motivate diligent and skilled attorneys to maximize their clients' recoveries.
[23] On remand, the court could choose to apply the "common fund doctrine" to calculate the attorney's fees to be paid by the recipients of the settlement proceeds. Vincent v. Hughes Air W., Inc., 557 F.2d 759, 769-70 (9th Cir.1977).

The common fund doctrine provides that a private plaintiff, or his [or her] attorney, whose efforts create, discover, increase or preserve a fund to which others also have a claim is entitled to recover from the fund the costs of [] litigation, including attorney's fees.
....
[T]he doctrine is designed to spread litigation costs proportionately among all the beneficiaries so that the active beneficiary does not bear the entire burden alone and the "stranger" beneficiaries do not receive their benefits at no cost to themselves.
Id. at 769.
[24] The only element of the September 4, 1990 settlement that does not require judicial review is the establishment of paternity. Resolving that dispute in favor of paternity did not disadvantage the child; the parents, as adults, are properly foreclosed from raising that issue. The proper course on remand will give them the consideration to which they are entitled for conceding the paternity issue. Assuming the court does not find they are barred by their failure to offer admissible evidence in 1992, they may offer evidence of non-paternity on remand, not to set aside the 1990 paternity finding, but to satisfy Rule 90.2 by demonstrating the value of the claim they relinquished.