Maria CLEMENT, as Co–Personal Repre-
sentative of the Estate of Mary A.
Fulton, Deceased, Appellant,

v.

Mike FULTON, as Co–Personal Represen-
tative of the Estate of Mary A. Fulton,
Deceased, and Sisters of Providence in
Washington, d/b/a Providence Alaska
Medical Center, Appellees.

No. S–11077.

Supreme Court of Alaska.

April 8, 2005.

Thomas S. Gingras, and Erin K. Egan, Eide, Miller & Pate, P.C., Anchorage, for Appellant.

Laurel J. Peterson, Laurel J. Peterson, P.C., Anchorage, for Appellee Mike Fulton.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

Mary Fulton died several days after a hospital allegedly failed to diagnose and

treat her medical condition, leukemia. She was survived by her husband and two minor children. The children contend that the superior court misallocated the wrongful death settlement proceeds paid by the hospital. Because the court did not clearly err in rejecting the children's assertion that Mary Fulton's life expectancy would have been only one year even if she had been correctly diagnosed, we affirm the allocation.

## II. FACTS AND PROCEEDINGS

Mary Fulton was the primary breadwinner in the Fulton family; she supported her husband, Michael Fulton, and her two minor children, Savannah and Christopher. On November 25, 1999, Mary sought treatment for headaches and weight loss at Providence Alaska Medical Center. As a result of a blood test mix-up, the hospital failed to diagnose her true medical condition, and she was discharged. She actually had acute leukemia. She returned to the hospital on November 29 and died on November 30, five days after she first sought treatment, following a hemorrhage in her right temporal lobe.

Mary's estate, through co-personal representatives Maria Clement and Michael Fulton, sued the hospital for damages under Alaska's survivorship and wrongful death statutes, claiming the hospital misdiagnosed her condition and failed to give her proper care, causing her death.[1] Maria Clement is one of Mary's adult daughters. The estate and the hospital eventually agreed to settle the lawsuit for $500,000, but no agreement was reached on how to allocate the settlement funds between Mary Fulton's two minor children and her husband.

In November 2002 Michael Fulton moved for superior court approval of the amount of the proposed settlement and for allocation of the settlement proceeds to the three surviving statutory dependents in accordance with *Horsford v. Estate of Horsford*.[2] Statutory dependents are the statutory beneficiaries recognized in the Alaska Wrongful Death Act, AS 09.55.580. Under *Horsford*, wrongful death settlement proceeds are allocated based upon the life expectancy of the decedent and the years each statutory dependent could reasonably expect to receive significant benefits from the decedent.[3] Michael claimed that application of the *Horsford* formula would entitle him to sixty-three percent of the settlement.

Clement, on behalf of the minor children, opposed Michael's proposed allocation because she asserted that, among other reasons, his allocation assumed Mary had a full life expectancy. Arguing in part that "[i]t is incorrect to apply a normal life expectancy for Mary Fulton when she more likely than not would only have survived another year," Clement urged the superior court to depart from the *Horsford* formula and allocate the proceeds on equitable grounds. She also contended that Michael should not share in the settlement at all because Mary had intended to divorce him. She argued that Michael should receive nothing because he had emotionally and physically abused the children.

After hearing evidence on February 11 and 27, 2003 and oral argument, Superior Court Judge Sen K. Tan approved the proposed settlement with the hospital and allocated the proceeds among the three beneficiaries. In allocating the proceeds, the superior court held that "this is not a case where the Horsford formula should be applied." Observing that the *Horsford* formula "is not a hard and fast rule and ... can be modified for longer periods of dependency, [and] expectations of contribution beyond the age of majority," or abandoned if necessary, the superior court concluded that the children's need for mental health treatment justified a departure from the formula. The court balanced the needs of the children against the needs of Michael Fulton, a seasonal worker with a sporadic work history, and allocated forty-five percent of the settlement to Michael, twenty percent to Christopher, and thirty-five percent to

---

1. AS 09.55.570; AS 09.55.580.

2. *Horsford v. Estate of Horsford,* 561 P.2d 722 (Alaska 1977). Wrongful death damages are assessed under the *Horsford* formula rather than in accordance with Alaska's laws of intestate succession. *Id.* at 726.

3. *Id.* at 725, 727.

Savannah. The court denied Clement's reconsideration motion. She now appeals.

## III. DISCUSSION

### A. Standard of Review

 We review for clear error the factual findings that supply the foundational basis upon which to apply *Horsford* in allocating a wrongful death action recovery.[4] We will reverse a finding of fact as clearly erroneous when we are left with a definite and firm conviction based on the totality of the record that the superior court has made a mistake.[5] To the extent the superior court, in determining the most equitable allocation,[6] deviates from the allocation strictly compelled by the *Horsford* formula or chooses not to apply the formula, we apply an abuse of discretion standard of review and will not reverse unless the allocation is clearly unjust.[7]

### B. It Was Not Clear Error for the Superior Court To Reject Clement's Assertion that Mary Had a Life Expectancy of Only One Year.

 In contending that it was error to allocate anything, or so much, to Michael, Clement argues that the superior court erred in finding that Mary had a life expectancy of more than one year. Mary's life expectancy is one factor potentially relevant to determining the expected years of dependency of her minor children and husband. Under the *Horsford* formula, the superior court allocates wrongful death damages among the beneficiaries based on each beneficiary's expected years of reasonably significant dependency.[8] The number of years each beneficiary is expected to be dependent on the decedent out of the total number of years of dependency determines the beneficiary's share of the settlement proceeds.[9] The formula assumes that the annual pecuniary loss for each statutory beneficiary is equal.

Michael's proposed allocation assumed that he would predecease Mary; it therefore used his life expectancy, not Mary's, to estimate the duration of his dependency. Michael's proposal calculated each minor child's expected dependency to the age of majority. Based on the beneficiaries' relative years of expected dependency and the *Horsford* formula, Michael's proposal allocated sixty-three percent of the proceeds to Michael, twenty-four percent to Savannah, and thirteen percent to Christopher.[10]

Clement's written opposition to Michael's proposed allocation asked the superior court to "abandon" the *Horsford* formula and divide the proceeds "equitably," allocating nothing to Michael. She based this argu-

---

4. *Id.* at 728.

5. *Donnybrook Bldg. Supply, Inc. v. Interior City Branch, First Nat'l Bank of Anchorage,* 798 P.2d 1263, 1266 (Alaska 1990).

6. *Horsford,* 561 P.2d at 724 (reviewing superior court's determination of "the most equitable allocation of the settlement proceeds between the competing beneficiaries").

7. *Cf. Estate of Brandon,* 902 P.2d 1299, 1307 (Alaska 1995) ("We apply an abuse of discretion standard in reviewing a trial court order approving a settlement of a minor's claims and distributing proceeds of a minor's settlement under Civil Rule 90.2.").

8. *Horsford,* 561 P.2d at 727. The record does not reflect whether or how the settlement with Providence was allocated between the wrongful death claim and the survivorship claim. Under the laws of intestacy, fifty percent of a survivorship recovery would be distributed to Michael and twenty-five percent would be distributed to each child. Nor does the record indicate how much of the settlement remunerated the family for non-economic losses such as pain and suffering and loss of consortium that are not governed by the *Horsford* formula. Because no party argues that the settlement reflected anything other than pecuniary losses, we need not consider whether the *Horsford* formula should not have been applied to the whole settlement.

9. *Id.* at 725.

10. Michael's proposed distribution added the expected years of dependency for Michael (30.5), Savannah (11.79), and Christopher (6.34) to arrive at the total number of years of dependency, 48.63 years. It then calculated the percentage of the total each beneficiary's dependency represented. Because Michael's 30.5 years represented 63 percent of the total, his proposal allocated 63 percent of the settlement proceeds to Michael. His damages expert reversed the children's years of dependency, and therefore reversed their proposed allocations, but Michael's memorandum proposal accurately stated their proposed allocations.

ment in part on her assertion that it was incorrect to assign a normal life expectancy to Mary "when she more likely than not would have survived only another year," even if the hospital had not been negligent.

The superior court eventually rejected the allocations proposed by both sides.[11] Recognizing that it could modify the formula to reflect the needs of the children,[12] it allocated forty-five percent to Michael, thirty-five percent to Savannah, and twenty percent to Christopher. Although the court never explicitly stated what life expectancy it attributed to Mary, it was clearly greater than one year, given the settlement share the court allocated to Michael.

### 1. It was not clear error to give little weight to the unsworn reports.

■ On appeal, Clement argues that it was clear error for the superior court not to find that Mary had a life expectancy of only one year. She asserts that the superior court improperly discredited or disregarded two medical reports that, she argues, indicated a "high likelihood" that Mary would have died within one year even if the hospital had not been negligent. Clement maintains that no evidence presented to the superior court would indicate otherwise.

The two reports to which Clement refers are unsworn medical reports prepared by Dr. John Kiraly and Dr. David Spindle. Before the estate and the hospital agreed to settle the lawsuit, Michael's lawyer had submitted both reports to representatives of the hospital and to counsel for Clement, the co-personal representative. Clement argues that Michael's use of the reports in that way

results in an admission under Alaska Evidence Rule 801(d)(2)(C) as a statement by a person authorized by the party to make a statement concerning the subject.[13] We held in *Frazier v. H.C. Price/CIRI Construction JV* that, under Evidence Rule 801(d)(2)(C), unsworn medical reports prepared at the appellee's request were not hearsay.[14] We concluded that the appellee had "vouched for the credibility and competence of the physicians" who prepared the medical reports when it asked the appellant to submit to examination by clinic physicians of the appellee's choice.[15]

Clement regards the reports as both (1) legally binding on Michael, because they were Evidence Rule 801(d)(2)(C) admissions, and (2) factually conclusive, because she reads them to establish that Mary's probable life expectancy was one year. She thus describes Dr. Kiraly's report as concluding that Mary "likely would have succumbed to acute leukemia and died within one year." She likewise asserts that his report "finds that Mary Fulton had a life expectancy of only one year due to her acute leukemia." Referring collectively to both reports, she asserts that they "concluded that it was likely that Mary Fulton would succumb to her illness within one year."

The superior court ultimately admitted the reports into evidence, but indicated that it would give them little weight because they contained unsworn opinions offered without sworn testimony to explain them. Following the hearing, the court issued its written decision in which it found:

> There is also an allegation that Mary Fulton was very ill, and in any event would have passed away in about a year or so.

11. Clement also contended during the superior court hearing that there was a "strong probability" Mary had approximately a one-year life expectancy and that therefore each beneficiary had lost only one year of dependence. This contention would have implied that the settlement proceeds should be allocated equally among the beneficiaries, but Clement expressly relied on it only to support her argument that the court should "abandon" *Horsford* and award little or nothing to Michael.

12. *See Horsford,* 561 P.2d at 728 (allowing for adjustment or abandonment of formula where evidence indicates longer period of dependency). *See also State, Dep't of Fish & Game v. Kacyon,*

31 P.3d 1276, 1282 (Alaska 2001) (recognizing that *Horsford* is not the exclusive allocation method).

13. Evidence Rule 801(d)(2)(C) provides: "A statement is not hearsay if the statement is offered against a party and is a statement by a person authorized by the party to make a statement concerning the subject."

14. *Frazier v. H.C. Price/CIRI Constr. JV,* 794 P.2d 103, 105 (Alaska 1990).

15. *Id.*

No medical doctors testified on this issue. The Clement representative would have this court draw this conclusion from the reports and documents submitted. This court has considered the evidence and finds that such a conclusion would be too speculative. In many instances, proper medical treatment may bring many diseases into remission, or prolong the life of the afflicted.

■ The main question Clement poses to us on appeal is whether it was clear error for the superior court to reject Clement's assertion that Mary would have lived only one year. Our independent review of the two medical reports persuades us that it was not clear error. In allocating wrongful death damages, the superior court should, absent reliable evidence to the contrary, assume that the decedent had a full life expectancy.[16] When evidence is offered that deviates from that assumption, the court must weigh all of the evidence, including evidence of the decedent's normal life expectancy.[17]

The evidence Clement offered did not compel a finding that it was reliable and conclusive, or even very probative. It consisted of unsworn expert opinions prepared for the wrongful death lawsuit. The reports focused on the short-term consequences of the missed diagnosis rather than Mary's long-term prognosis. They seem to primarily address a causal relationship between Mary's death and the hospital's conduct. The authors never explained Mary's precise underlying medical condition, nor did they elaborate on the potential effect of available therapy.[18] Dr. Kiraly's report merely quoted the remission and relapse rates of leukemia patients generally. The court had no opportunity to question the authors regarding Mary's specific chances for survival.

The reports themselves recognize that Mary could have lived longer, perhaps much longer, than one year had she received prop-er medical care. Dr. Spindle's report expresses an opinion that the misdiagnosis "might well have been prevented [enabling] her to have a much longer life with the correct medical treatment." This evidence alone was sufficient to support the superior court's finding. Furthermore, Dr. Kiraly's report expresses an opinion that the misdiagnosis prevented Mary from receiving therapy "that may have averted her premature death." His report also states that it appeared that Mary "lost the opportunity for both short-term and long-term survivals as a result of missed diagnosis." The court could have permissibly read the reference to her "long-term" survival to imply that proper care would have made long-term survival a realistic possibility.

Dr. Kiraly's report also states that "twenty to thirty percent of patients [who receive chemotherapy] may be expected to remain in long-term remission, whereas 70–80% will usually relapse within one year and succumb to their disease." Dr. Kiraly did not discuss factors that would indicate whether Mary was in one group or the other. His statement that many patients will "usually" relapse within one year and succumb to their disease, read at face value, literally only offers an opinion that relapse will usually occur within one year and offers no opinion about when death will ensue. If this is how the superior court read this passage in Dr. Kiraly's opinion, it would have been a permissible reading.

The dissent states that "the *only* evidence in the record specific to Mary Fulton indicated that her life expectancy would not be normal."[19] But neither doctor indicated what her life expectancy would have been, whether her disease probably would have caused her to die in the near future, or even whether she would die before Michael (whose life expectancy was the basis for his proposal). Certainly neither report directly states

---

**16.** *Hinchey v. Hinchey,* 722 P.2d 949, 953 n. 9 (Alaska 1986); *Morrison v. State,* 516 P.2d 402, 406 (Alaska 1973).

**17.** *Levar v. Elkins,* 604 P.2d 602, 604 (Alaska 1980).

**18.** Clement's lawyer told the superior court that Mary had acute myelogenous leukemia. Neither

report uses that term. Dr. Kiraly's report states that "it appears that the patient had acute leukemia." Dr. Spindle's report does not refer to leukemia.

**19.** Op. at 936–937 (emphasis in original).

that Mary Fulton would have died within one year regardless of the misdiagnosis, and Dr. Spindle's report instead notes the lost possibility of a "much longer life." It was not clear error, therefore, for the superior court to regard Clement's conclusion that Mary would have lived no longer than about a year as "too speculative."

Nor did the court inappropriately speculate when discussing the potential effect of treatment. The superior court's observation that "proper medical treatment may bring many diseases into remission, or prolong the life of the afflicted" echoes the experts' own statements.

Clement also briefly contends that the superior court "erred in concluding that Mary Fulton had a normal life expectancy." This argument is unavailing for several reasons.

First, it is unpersuasive on the merits. As we saw above, Dr. Spindle's opinion that Mary might have lived a "much longer life" supports the superior court's apparent finding that Mary might have lived much longer than one year and its express finding that it was "too speculative" to conclude that Mary would have lived no longer than a year. Likewise, Dr. Kiraly's report contains passages (discussed above) that support the court's express finding.

■ This argument also subtly, but unfairly, recasts the way the case was presented to the superior court and the arguments Clement made below. The issue as the parties presented it below was whether to *deviate* from *Horsford*, not whether to *follow Horsford*. This had the effect of putting the burden on Clement to affirmatively persuade the court that Mary would have lived only about one year, i.e., would not have lived much longer.

■ Consequently, Clement affirmatively contended below that the evidence established that Mary's life expectancy was only about one year, not that there was no evidence she would have had a normal life expectancy. She cited Dr. Kiraly's report in her pre-hearing written opposition to Michael's proposed allocation and affirmatively contended that it established that Mary's life expectancy was only about one year. And at the outset of the hearing, her lawyer referred again to Dr. Kiraly's report to support her affirmative contention, but did not argue that there was no evidence of normal life expectancy, or that, absent any such evidence, Michael should lose. Clement then undertook to show why the *Horsford* formula should not be followed, and began calling witnesses who testified in support of her "equitable argument"—that Michael should take nothing because Michael would not support the children and had abused or harmed them, that Mary and he had separated, and that Mary planned to divorce him. All the hearing testimony concerned these allegations; none of it concerned Mary's (or Michael's) life expectancy. During the final arguments below, she asserted that she had offered evidence establishing that there was a "strong probability" Mary would have lived only about a year. After the court ruled against her, she sought reconsideration on the ground the court erred in discounting the opinion of Dr. Kiraly. She did not argue that Michael had failed to discharge any burden of persuasion with respect to life expectancy or that there was no evidence that Mary would have had a normal life expectancy (or, more relevantly, that Mary would have had a long life or outlived Michael). At no time did Clement assert that Michael failed to establish either that his life expectancy was 30.5 years or that a person Mary's age would outlive him.[20] She never contended that Michael's proposed allocation was deficient because he failed to offer evidence that a person with Mary's underlying medical condition would live less than the 30.5 years assumed by Michael's damages expert.

Thus, Clement did not affirmatively argue below that there was no evidence bringing Mary within *Horsford*, but instead affirmatively argued only that Dr. Kiraly's report should have convinced the superior court to

---

**20.** A court can take judicial notice of mortality tables and should not deviate from them unless credible contrary evidence is admitted. *Morrison v. State,* 516 P.2d 402, 406 (Alaska 1973) ("[W]hile the mortality table is not binding on the court, there must be some evidence in order to justify a departure from the table.").

depart from *Horsford.* As the parties presented it, the allocation dispute therefore turned on whether the superior court was persuaded by the two reports. It was not. As we concluded above, that was a permissible choice.

Moreover, Clement's argument below was not nuanced; it was effectively all or nothing, because her focus was on preventing Michael from receiving any part of the settlement. Clement used her contention that Mary would have lived only one year to set the stage for her argument that the superior court should altogether "abandon" *Horsford,* and, applying equitable principles, award everything to the children. Clement did not contend below that Mary might have had a somewhat shorter-than-normal life-span. That position would have been inconsistent with avoiding *Horsford* and preventing Michael from recovering anything. It was critical to her approach that the court find that Mary would have lived only about one year.

Consistent with the way the dispute was argued, the superior court did not affirmatively find that Mary would have had a normal life expectancy; it only found that Clement had not established that Mary would have lived only about one year.

It therefore inverts the case as it was tried to say that the superior court erred in concluding that Mary would have lived a normal life expectancy. What the court really did was find that the reports did not require the court to accept Clement's "speculative" position that Mary would have died within a year. That finding was not clearly erroneous.

### 2. Clement does not assert and did not preserve a claim that the superior court prevented Dr. Kiraly from testifying.

◼ The dissent argues that the superior court contributed to the lack of credible evidence of Mary's life expectancy by denying Clement the opportunity to have Dr. Kiraly testify telephonically.[21] But Clement raises no such contention on appeal, and the record establishes that she did not preserve any

such argument below, either at the hearing or in her reconsideration motion.

After both sides had called and examined all of their witnesses at the evidentiary hearing, Clement's lawyer advised the court that he had no additional witnesses. The parties' lawyers then presented their oral arguments on the allocation issues. Michael's lawyer argued, among other things, that "This is an allocation with regards to the statutory [dependents] and I've heard nothing that should deviate from … Horsford at this point."

In his opposing argument, Clement's lawyer referred to Dr. Kiraly's opinion letter submitted with Clement's pre-hearing memorandum opposing Michael's proposed allocation. He argued that the letter expressed an opinion that Mary would have had a twenty to thirty percent chance of remaining in long-term remission. He therefore contended, among other things, that *Horsford* did not apply.

In reply, Michael's lawyer relied on Dr. Spindle's report to argue that proper treatment might have prevented the hemorrhage that caused Mary's death and allowed time to treat the underlying disease. He also argued that it was "spurious" to say that anyone had "come here and testified under oath—in fact these guys haven't—that she would have been anything other than the 20 percent …." The superior court immediately stated that it would not rely on the unsworn letters.

Clement's lawyer then asked the court, if it did not accept the letters as admissions by Michael, to reopen the hearing to allow Dr. Kiraly's testimony. The court again stated that it would give his letter little weight if it were admitted; it then gave Clement an opportunity to apply "further" and to explain why Clement's lawyer had not offered testimony from Dr. Kiraly earlier. When counsel again offered to call Dr. Kiraly, the court admitted both letters as evidence to remove "the issue" and stated that Dr. Kiraly's letter was unsworn and would be given "very little weight." The court then asked the lawyers if there were "[a]nything further?" Clement's lawyer did not again ask to be allowed to call Dr. Kiraly. He did not object to the proce-

---

21. Op. at 936.

dure the court adopted when it admitted the two letters into evidence after indicating it would give them "little weight." Nor, after the court stated that it would give the reports little weight, did Clement's lawyer ask for leave to present testimony from Dr. Kiraly to explain his letter or in lieu of it. Clement therefore did not preserve any possible claim that the court erroneously prevented her from calling Dr. Kiraly as a witness.

 It also cannot be said that the superior court prevented Clement from offering better evidence from Dr. Kiraly, because there is no indication what he might have said. Clement made no offer of proof to establish that he would testify to anything beyond what he had stated in his letter. When a court excludes unspecified evidence, a party's failure to make an offer of proof acts as waiver to any claim of error.[22] Alaska Evidence Rule 103(a)(2) requires a party to show that "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." The letter does not clearly express an opinion that Mary Fulton would have lived no more than one year if she had been properly diagnosed and treated. Because there was no offer of proof, Clement did not preserve any contention that Dr. Kiraly, if permitted to testify, would have offered an opinion that Mary would probably have lived no more than a year, or any other period.

Finally, Clement does not argue that there was a genuine factual dispute about Mary Fulton's life expectancy that requires remand and more evidence. She only argues that, as a matter of law, Dr. Kiraly's letter establishes that Mary Fulton would have died within one year. That was also her position below.

The superior court therefore cannot be regarded as having prevented her from offering better telephonic testimony from Dr. Kiraly.

## C. The Superior Court Did Not Otherwise Abuse Its Discretion in Allocating the Settlement Proceeds.

 Clement also argues that the superior court erred by failing to adjust the allocation for other reasons. Alleging that Michael physically and emotionally abused Savannah and Christopher, she argues that Michael's misconduct requires an equitable adjustment of the allocation in favor of the minor children.

 Although *Horsford* permits the court to modify or abandon its formula "if there is evidence of circumstances indicating a longer period of dependency," it requires that the allocation approximate the actual losses of each beneficiary.[23] It assumes that the annual pecuniary loss of each statutory beneficiary is equal, but this assumption is not justified in every case. Here the superior court recognized that Savannah's health problems required special attention and would probably require treatment beyond her age of majority. The allocation therefore accounted for those needs. The court also considered Christopher's need for future counseling "to assist in his transition to his new environment and into adulthood." These were unquestionably relevant factors.

It was not error, however, for the court to disregard the other factors advanced by Clement. Whether Michael had abused the children is not relevant to the determination of their actual losses for their mother's death. Moreover, with regard to allegations of "patterns of physical and emotional abuse," Judge Tan found only that there were "instances of inappropriate discipline of the children by Michael."

In the superior court, Clement also offered evidence that Mary and Michael had separated and that Mary intended to divorce him. She briefly suggests on appeal that this evidence is an "additional factor" we should consider in reviewing the allocation. But her appellate briefs provide no substantive discussion of this proposition. It is therefore waived, and we do not consider it.[24]

**22.** *Walden v. Dep't. of Transp.,* 27 P.3d 297, 304 (Alaska 2001).

**23.** *Horsford,* 561 P.2d at 726–28.

**24.** *Adamson v. University of Alaska,* 819 P.2d 886, 889 n. 3 (Alaska 1991) ("Where a point is given only a cursory statement in the argument

## IV. CONCLUSION

The superior court did not clearly err in failing to find that Mary Fulton, even if properly diagnosed, would not have lived more than one year. Nor did it err in disregarding factors other than the children's future needs in allocating the settlement proceeds. We therefore AFFIRM the court's allocation of the proceeds.

FABE, Justice, dissenting.

I disagree with the court's conclusion that the superior court's allocation of the settlement proceeds can be affirmed. Because the superior court's allocation decision does not contain an express finding as to Mary Fulton's life expectancy, it is difficult to review its decision on this issue. But in recognizing that Mary's estranged husband, Michael Fulton, "in terms of number of years, has a claim to a substantial percentage of the settlement" and reducing Michael's requested share based only on "the additional needs of the children," it appears that the superior court's decision was premised on Mary having a normal life expectancy. Yet it was undisputed that Mary Fulton suffered from acute leukemia, and the superior court admitted Dr. Kiraly's expert report, which stated that even with prompt diagnosis and timely start of induction chemotherapy regimens, seventy to eighty percent of patients with acute leukemia "will usually relapse within one year and succumb to their disease." Nowhere in the record is there evidence to support a finding that it was probable that Mary Fulton would have a normal life expectancy, even if her disease had been treated without delay. Because it appears that the superior court must have assumed that Mary would have had a normal life expectancy when it determined that her estranged husband, Michael Fulton, was entitled to a substantial percentage of the settlement proceeds paid to her estate, I would reverse the trial court's allocation decision.

Although the court frames the issue as whether it was error "for the superior court to reject Clement's assertion that Mary had a life expectancy of only one year," Clement makes a separate argument that "the trial court erred in concluding that Mary Fulton had a normal life expectancy." The majority has not addressed this question in its opinion, other than to remark that "[i]n allocating wrongful death damages, the superior court should, absent reliable evidence to the contrary, assume that the decedent had a full life expectancy." [1] But there *was* reliable evidence to the contrary in this case. Dr. Kiraly's admitted expert report stated that even with chemotherapy treatment, seventy to eighty percent of properly diagnosed patients with acute leukemia "will usually relapse within one year and succumb to their disease." And while the majority seems to fault Clement for submitting an unsworn expert report to which the trial court was entitled to give little weight, the trial court contributed to this problem.

When Dr. Kiraly's expert report was first proffered by Clement at the hearing, the trial court expressed concern that the opinion was unsworn. Clement's counsel accordingly requested "leave to just reopen the hearing for the purposes of . . . listening to [Dr. Kiraly's] testimony . . . as to that opinion letter and leave him open for cross-examination." The trial court evinced frustration that the doctor wasn't immediately available and stated that although Clement could make further application to open the record, Clement would have to explain why the doctor wasn't in court for the hearing. Clement's counsel responded by explaining that Dr. Kiraly was in California and that counsel had assumed that the doctor's opinion could be relied upon as an admission by Mike Fulton during the underlying litigation. Clement's counsel further suggested that if the court would not consider the letter without Dr. Kiraly's testimony, Dr. Kiraly could be made available by phone. The superior court replied that it would "just remove the issue and read the letter. It's admitted as evidence. Okay?"

Based on the trial court's decision to admit the letter in lieu of accepting Clement's offer to produce the doctor, the *only* evidence in the record specific to Mary Fulton indicated

---

portion of a brief, the point will not be considered on appeal.").

1. Op. at 932.

that her life expectancy would not be normal. Although "we ordinarily will not overturn a trial court's finding based on conflicting evidence,"[2] there is no conflicting evidence in this case. Even if Dr. Kiraly's report was insufficiently specific to support Clement's position that Mary would have lived no more than one year, the expert report certainly placed the question of Mary's life expectancy in dispute and so precluded the trial court from accepting as undisputed Fulton's position that Mary could expect to have a normal life span. In light of Dr. Kiraly's admitted report and the total dearth of evidence that Mary Fulton would have a normal life expectancy, the trial court's surmise that Mary Fulton might live longer than predicted by the experts because "[i]n many instances, proper medical treatment may bring many diseases into remission, or prolong the life of the afflicted" is simply not supported by the record. Thus, I would hold that the trial court's apparent determination that Mary Fulton would have had a normal life expectancy was clear error, and would remand the case for a determination of her life expectancy and reallocation of the settlement proceeds in accordance with that finding.

**2.** *Martin N. v. State, Dep't of Health & Soc. Servs.,* 79 P.3d 50, 53 (Alaska 2003); *see also In re Friedman,* 23 P.3d 620, 625 (Alaska 2001) ("We ordinarily will not disturb findings of fact made upon conflicting evidence.").